307 F.3d 859
 CITY OF LOS ANGELES, California; City of San Antonio, Texas; City of Inglewood, California; County of Santa Clara, California; City of Stamford, Connecticut; Laura Chick, individually; Laura Chick, in her official capacity as a member of the Los Angeles City Council; Mike Feuer, individually; Mike Feuer, in his official capacity as a Member of the Los Angeles City Council; Mike Hernandez, in his official capacity as a Member of the Los Angeles City Council; Nate Holden, individually; Nate Holden, in his official capacity as a Member of the Los Angeles City Council; Cindy Miscikowsky, individually; Cindy Miscikowsky, in her official capacity as a Member of the Los Angeles City Council; Nick Pacheco, individually; Nick Pacheco, in his official capacity as a Member of the Los Angeles City Council; Alex Padilla, individually; Alex Padilla, in his official capacity as a Member of the Los Angeles City Council; Rita Walters, individually; Rita Walters, in her official capacity as a Member of the Los Angeles City Council; Mark Ridley-Thomas, individually; Mark Ridley-Thomas, in his official capacity as a Member of the Los Angeles City Council; Fernando Ferrer, individually; Fernando Ferrer, in his official capacity as President of Bronx Borough, New York, New York; County of Los Angeles; City and County of San Francisco; Bronx Borough, New York City, New York; Brooklyn Borough, New York City, New York; Albuquerque, New Mexico; Toledo, Ohio; San Jose, California; Cruz M. Bustamante, individually; Cruz M. Bustamante, in his official capacity as Lieutenant Governor for the State of California; Ruth Galanter, individually; Ruth Galanter, in her official capacity as a Member of the Los Angeles City Council; Carelton S. Finkbeiner, individually; Carelton S. Finkbeiner, in his official capacity as Mayor of Toledo, Ohio; Peter F. Vallone,
individually; Peter F. Vallone, in his official capacity as Speaker of the New York City Council; C. Virginia Fields, individually; C. Virginia Fields, in her official capacity as President of Manhattan Borough, New York City, New York; The New York Council; City of Chicago, Illinois; Michael Madigan, individually; Michael J. Madigan, in his official capacity as Minority leader of the Illinois Senate; Emil Jones, Jr., individually; Emil Jones, Jr., in his official capacity as Minority leader of the Illinois Senate; John H. Stroger, Jr., individually; John H. Stroger, Jr., in his official capacity as President of the Cook County Board of Commissioners; Claire Schulman, individually; Claire Schulman, in her official capacity as President of Queens Borough, New York City, New York, Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF COMMERCE; Donald Evans, Secretary of the Department of Commerce, in his official capacity, Defendants-Appellees.
 No. 01-55986.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 2002.
 Filed September 27, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Thomas M. Riordan (argued), Brian S. Currey, Jeremy I. Levin, O'Melveny & Myers, Los Angeles, CA, for the plaintiffs-appellants.
 Michael S. Raab (argued), Mark B. Stern, Robert D. McCallum, Jr., John S. Gordon, U.S. Department of Justice, Washington, DC, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Gary A. Feess, District Judge, Presiding. D.C. No. CV-01-01671-GAF.
 Before: FERGUSON, REINHARDT, and GRABER, Circuit Judges.
 Opinion by Judge FERGUSON; Dissent by Judge REINHARDT.
 FERGUSON, Circuit Judge.
 
 
 1
 Various municipalities and officials ("Appellants") filed the instant lawsuit against the Department of Commerce and Secretary of Commerce Donald Evans to compel the Secretary to adopt statistically adjusted population data as the official Census 2000 for redistricting purposes. Secretary Evans decided against its use based on the recommendation of a committee of senior Census Bureau officials and statisticians who, after extensive study, expressed serious concerns regarding possible flaws in the statistical (or sampling) methodology.
 
 
 2
 The District Court rejected Appellants' claim that Secretary Evans' decision not to use the adjusted data (hereinafter "adjustment decision") violated 13 U.S.C. § 195, which requires the Secretary of Commerce to use "sampling" in conducting the census if "he considers it feasible." The District Court found moot Appellants' claim that Secretary Evans violated the notice-and-comment requirements of the Administrative Procedure Act ("APA") in revoking former Secretary of Commerce William Daley's delegation of the adjustment decision to the Director of the Bureau of Census. We affirm.
 
 I. BACKGROUND
 
 3
 The Constitution requires Congress to conduct a decennial census "in such Manner as they shall by Law direct" for apportioning congressional representation to the states. U.S. CONST. art. I, § 2, cl. 3; id. amend. XIV, § 2. By means of the Census Act, Congress has delegated broad discretion to the Secretary of Commerce to conduct the census "in such form and content as he may determine, including the use of sampling procedures and special surveys." 13 U.S.C. § 141(a). The Secretary, in turn, oversees the Bureau of the Census, an agency within the Department of Commerce responsible for conducting the decennial census. 13 U.S.C. § 2, 4 & 21.
 
 
 4
 Although the Constitution mandates only that the census be taken for reapportionment purposes, the census data is used for myriad other purposes. Wisconsin v. City of N.Y., 517 U.S. 1, 5-6, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996) (describing secondary uses of census data). Appellants challenge the Census 2000 results because of their effect on the allotment of federal and state funds, as well as the redistricting of their respective state legislatures.
 
 A. Sampling and the Census Act
 
 5
 At issue in this case is whether the Secretary was required to statistically adjust the results of Census 2000 pursuant to 13 U.S.C. § 195, as amended in 1976. Since 1940, the Bureau has employed sampling techniques to gather supplemental information regarding the population. U.S. Bureau of the Census, Dep't of Commerce, Accuracy and Coverage Evaluation: Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000, 65 Fed.Reg. 38,374, 38,382 & n. 21 (June 20, 2000) ("A.C.E. Report").
 
 
 6
 In 1957, the Secretary requested that Congress enact a law that would clearly authorize the use of sampling in conducting the census. Utah v. Evans, ___ U.S. ___, ___, 122 S.Ct. 2191, 2202, 153 L.Ed.2d 453 (2002) (citing legislative history); Dep't of Commerce v. U.S. House of Reps., 525 U.S. 316, 336, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (amended opinion) (same). In response, Congress amended the Census Act by enacting § 195, which provided that the Secretary "may, where he deems it appropriate, authorize the use of the statistical method known as `sampling' in carrying out the provisions of this title" for purposes other than apportionment. Census Act of 1957, Pub.L. No. 85-207, § 14, 71 Stat. 481, 484 (1957) (codified at 13 U.S.C. § 195 (1957)); see Dep't of Commerce, 525 U.S. at 336, 119 S.Ct. 765. In 1976, Congress amended § 195 to provide:
 
 
 7
 Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.
 
 
 8
 Mid-Decade Census of Population Act of 1976, Pub.L. No. 94-521, § 10, 90 Stat. 2459, 2464 (1976) (emphasis added).
 
 
 9
 Since the enactment and revision of § 195, the Bureau has considered the use of statistical sampling to compensate for the error rate in the decennial census. In particular, it has studied the possibility of implementing statistical adjustments to the census data to compensate for the undercount of the population and the disproportionate undercount (or "differential undercount") of racial and ethnic minorities, children, and renters. See 65 Fed. Reg. 38,376; see also Wisconsin, 517 U.S. at 7-8, 116 S.Ct. 1091. However, for both Census 1980 and Census 1990 (and most recently for Census 2000), the Secretary ultimately decided against the use of the statistically adjusted data as the official census and relied instead on the headcount data. Id. at 8, 116 S.Ct. 1091.
 
 B. Census 2000
 
 10
 In 1997, the Bureau submitted a plan to Congress for Census 2000. See U.S. BUREAU OF THE CENSUS, DEP'T OF COMMERCE, REPORT TO CONGRESS: THE PLAN FOR CENSUS 2000, 23 (Aug.1997) ("Census 2000 Plan"). The Census 2000 Plan incorporated the findings of the National Academy of Sciences ("NAS") that sampling could be used as an alternative to traditional means of enumeration.[1] Accordingly, the Census 2000 Plan provided for a "limited use of sampling" in ascertaining the population. Significantly, the Census 2000 Plan would have resulted in one set of census results: the initial headcount data adjusted by statistical sampling techniques. Id. at 52.
 
 
 11
 The Census 2000 Plan precipitated legal challenges to the use of statistical sampling in determining the population. In 1999, the Supreme Court held that "the Census Act prohibits the proposed uses of statistical sampling in calculating the population for purposes of apportionment." Dep't of Commerce, 525 U.S. at 343, 119 S.Ct. 765. Following Department of Commerce, the Bureau modified its plan to statistically adjust the Census 2000 only for purposes other than apportionment. 65 Fed.Reg. 38,377.
 
 
 12
 1. The Accuracy and Coverage Evaluation ("A.C.E.") Report
 
 
 13
 On June 2000, the Bureau issued the A.C.E. Report, which described the statistical methodology to be used for Census 2000. The Report set forth the Bureau's preliminary determination that the use of the statistically adjusted data was feasible in terms of both the statutory deadline for releasing redistricting information and the improvement of the census' accuracy. Id. at 38,374.
 
 
 14
 The A.C.E. methodology is based on a "dual system estimation," also referred to as "capture/recapture." Id. at 38,378. This statistical method compares the results of the initial census with those of post-enumeration surveys from sample blocks of the population to determine the under- or over-count of initial census data according to post-strata characteristics (geography, age, sex, race, and housing status). Id. It then extrapolates the rate of error for each group to the entire population and statistically adjusts the initial data on a nationwide scale. Id.; see generally Wisconsin, 517 U.S. at 8-9, 116 S.Ct. 1091(colorfully describing capture/recapture by analogy to counting pumpkins in a large pumpkin patch).
 
 
 15
 The A.C.E. Report made a preliminary determination that it was feasible to use the A.C.E. methodology to produce statistically adjusted census data by the April 1, 2001, statutory deadline.[2] 65 Fed.Reg. 38,374. The Report defined § 195's statutory term "feasible" as encompassing two components: "operational" and "technical" feasibility. Id. Operational feasibility referred to the logistical possibility of adjustment in light of "other aspects of the census plan, timing, and funding constraints." Id. at 38,379. In contrast, technical feasibility referred to the determination that "the use of sampling is expected to improve the overall accuracy of census data." Id.
 
 
 16
 Although the A.C.E. Report reflected an initial prediction that the A.C.E. would improve the census, the Bureau needed to study the data further to determine whether the A.C.E. had met its expectation of "improv[ing] overall numeric and distributive accuracy and ... reduc[ing] the differential under-count." Id. at 38,387. The A.C.E. Report recommended that "statistical correction is appropriate absent strong evidence that it will degrade the overall quality of the final census data." Id. However, it cautioned:
 
 
 17
 The Census Bureau will not ... release corrected redistricting data until it has brought its technical judgment to bear in assessing the available data to verify that its expectations have been met. The Census Bureau will consider operational data to validate the successful conduct of the A.C.E., assess whether the A.C.E. measurements of undercount are consistent with historical patterns of undercount and independent Demographic Analysis benchmarks, and review measures of quality.
 
 
 18
 Id. at 38,393.
 
 
 19
 To ensure that the final decision was insulated from political manipulation, the Bureau proposed that the Executive Steering Committee for A.C.E. Policy ("ESCAP") — a committee of senior Bureau officials and statisticians — assess the effectiveness of A.C.E. and "make a recommendation to the Census Bureau Director regarding the use of the statistically corrected census data." Id. at 38,394.
 
 
 20
 2. Promulgation and Revocation of the "Daley Rule"
 
 
 21
 On October 6, 2000, former Secretary of Commerce William Daley promulgated a rule in compliance with the notice-and-comment procedures of the APA, delegating the adjustment decision to the Director of the Bureau.[3] Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. [§]141(c) and Availability of Other Population Information, 65 Fed. Reg. 59,713, 59,716 (Oct. 6, 2000) (codified at 15 C.F.R. § 101.1(a) (2000)) ("Daley Rule"). The Daley Rule required that ESCAP's recommendation regarding the use of A.C.E. data be published. 15 C.F.R. § 101.1(b)(1). It also provided that the ESCAP Report would be released to the public and to the Census Director simultaneously. Id. § 101.1(b)(2). In addition, the Daley Rule required that the adjusted data be released to the public if the Census Director decided, against the recommendation of ESCAP, not to use the adjusted data. Id. § 101.2(b).
 
 
 22
 On February 16, 2001, Secretary Evans revoked the Daley Rule in all respects, except for the release of the ESCAP Report to the public. Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. §§ 141(c) and Availability of Other Population Information; Revocation of Delegation of Authority, 66 Fed. Reg. 11,231 (Feb. 23, 2001). The revocation did not provide for a public comment period, based on Secretary Evans' finding that it was a "rule of agency organization, procedure and practice." Id. at 11,232 (citing 5 U.S.C. § 553(b)(3)(A)).
 
 3. The ESCAP Report
 
 23
 In accordance with the A.C.E. Report's recommendations, ESCAP studied the proposed statistical adjustment to Census 2000. As defined by regulation, ESCAP was chaired by the Bureau's Associate Director for Decennial Census and included senior statisticians, demographers, and other senior professionals. 15 C.F.R. § 101.1(b)(3). On March 1, 2001, ESCAP unanimously recommended against the use of the A.C.E. data. See Executive Committee for Accuracy and Coverage Evaluation Policy, Recommendation Concerning the Methodology to be Used in Producing the Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. [§ ]141(c) (Mar. 1, 2001) ("ESCAP Report"), Report Notice, 66 Fed.Reg. 14,004 (Mar. 8, 2001).
 
 
 24
 ESCAP studied the operation of the A.C.E. according to the criteria set forth in the A.C.E. Report, including: (1) conduct of key operations, (2) consistency with historical measures of undercount, and (3) quality measures. Id. After many weeks of "examining voluminous evidence," ESCAP was unable to recommend the use of the A.C.E. data due to unresolved concerns about its reliability. Id. at 14,005. In particular, ESCAP found that the A.C.E. data diverged widely from the demographic analysis' estimate of the undercount and reflected possible synthetic and balancing errors.[4] 66 Fed.Reg. 14,005. Although further research may have proved the A.C.E. data to be more accurate, ESCAP's "uncertainty due to these concerns is too large at this time to allow for a recommendation to adjust." Id.
 
 4. Adjustment Decision
 
 25
 Following the release of the ESCAP Report, the Acting Director of the Bureau, William Barron, Jr., adopted ESCAP's recommendation not to use the A.C.E. data for redistricting purposes. Subsequently, Secretary Evans adopted both the Acting Director's and ESCAP's recommendation not to use the A.C.E. data and directed that only the unadjusted data be released for purposes of redistricting.
 
 C. Procedural History
 
 26
 On February 21, 2001, Appellants brought this lawsuit against Secretary Evans, challenging his revocation of the Daley Rule without notice and comment. Following the release of the ESCAP Report and Secretary Evans' adjustment decision, Appellants moved for a temporary restraining order and injunctive relief on the grounds that Secretary Evans' adjustment decision deprived them of federal and state funding as well as proper representation in their respective state legislatures. They argued that the adjustment decision violated 13 U.S.C. § 195 because he had decided against the use of sampling even though it was "feasible."
 
 
 27
 The District Court denied both preliminary and permanent injunctive relief and dismissed the action. Applying the standard set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the District Court found that deference to Secretary Evans' interpretation of § 195 was appropriate because the statute did not reveal Congress' intent regarding the Secretary's obligation to release the adjusted data. In addition, the District Court found Secretary Evans' interpretation of § 195 to be a permissible construction of the statute. Finally, the District Court concluded that ESCAP's application of this standard was reasonable in light of the inconsistency of the A.C.E. data with the demographic analysis, as well as concerns with synthetic and balancing errors. Accordingly, the District Court upheld Secretary Evans' adjustment decision.
 
 II. STANDARD OF REVIEW
 
 28
 We review de novo the District Court's interpretation of § 195. Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir.2001). We must affirm its "decision to deny injunctive relief ... unless it incorrectly applied the law, relied on clearly erroneous factual findings, or otherwise abused its discretion." Contract Servs. Network, Inc. v. Aubry, 62 F.3d 294, 297 (9th Cir.1995).
 
 III. DISCUSSION
 
 29
 In this case, Appellants seek to enjoin Secretary Evans' adjustment decision as violative of § 195 because, they contend, the use of the A.C.E. data for redistricting purposes was "feasible." In addition, Appellants argue that Secretary Evans' adjustment decision was invalid because the authority to make that decision had been delegated to the Director of the Bureau under the Daley Rule, and his revocation of the rule failed to comply with the APA's notice-and-comment procedures.
 
 
 30
 A. Legality of Secretary's Adjustment Decision under § 195
 
 
 31
 This is not the first time that the Secretary of Commerce's adjustment decision has been the subject of a legal challenge. Following Census 1990, the Supreme Court upheld the Secretary's decision not to statistically adjust the census as "well within the constitutional bounds of discretion over the conduct of the census." Wisconsin, 517 U.S. at 24, 116 S.Ct. 1091. More recently, the Supreme Court held in Department of Commerce that § 195 prohibited the Secretary from statistically adjusting the census for purposes of apportionment. 525 U.S. at 343, 119 S.Ct. 765. In this case, we are called upon to answer a question not answered by either Wisconsin or Department of Commerce: whether § 195 imposes an obligation on the Secretary to statistically adjust the census for redistricting purposes.[5]
 
 
 32
 In reviewing Secretary Evans' interpretation of § 195, we follow the two-part test established in Chevron. First, we must determine whether Congress' intent is clear as to the precise issue involved. Chevron, 467 U.S. at 842, 104 S.Ct. 2778. If we answer this question in the affirmative, our inquiry is at an end. Id. at 843, 104 S.Ct. 2778. "However, if the statute is ambiguous as to the question at issue, then we go to the second step and determine the meaning of the statute's language by giving deference to the governing agency's interpretation of the statute's language." Royal Foods Co. v. RJR Holdings Inc., 252 F.3d 1102, 1106 (9th Cir.2001) (citing Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778).
 
 1. Statutory Analysis of § 195
 
 33
 Our starting point in construing § 195 is the language of the statute itself. Id. (citing Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778). "We look to the text of the statute to `determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Id. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).
 
 
 34
 The relevant provision of § 195 states that "the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as `sampling' in carrying out the provisions of this title." 13 U.S.C. § 195. From the statutory language, the parties ascribe very different meanings. Appellants urge us to find that § 195 creates a presumption in favor of the adjusted data and admits of little administrative discretion. Appellees, on the other hand, argue that § 195 confers broad discretion upon the Secretary to determine in what instances and against what standard the use of sampling should be found feasible.[6]
 
 
 35
 a. § 195 Confers Discretion upon the Secretary
 
 
 36
 First, we disagree with Appellants that § 195 creates a presumption in favor of the adjusted data. Appellants conflate the Secretary's feasibility determination with what should follow from his finding of feasibility. Thus, Appellants conveniently skip over the critical first step — whether the Secretary considered it feasible to adopt the adjusted data as the official 2000 census for redistricting purposes. Yet, the operation of § 195 hinges entirely on this condition.
 
 
 37
 Our reading of the plain statutory text is that the combination of terms "shall" and "if he considers it feasible" demonstrates Congress' intent to strongly encourage the use of sampling while conferring meaningful discretion upon the Secretary to determine whether statistics should be used in any given instance. The language of § 195 is straightforward. It requires the Secretary to incorporate the use of statistical methodologies in the taking of the census if and where he considers it feasible. By its plain terms, the statute directs the Secretary to use sampling, but only "if he considers it feasible." 13 U.S.C. § 195. As a corollary, no sampling need be used if the Secretary does not consider it feasible.
 
 
 38
 Section 195 does not specify under what conditions the Secretary should find the use of sampling feasible. Nowhere does § 195 state, as Appellants would have us read it, that the Secretary should presume that statistical information is more reliable than unadjusted headcount data, or that he should strain to find the use of sampling feasible even though he is not fully certain about the ramifications of that choice. Instead, the statute vests discretion in the Secretary both to set the standard for feasibility and to decide whether that standard has been met.
 
 
 39
 Ignoring the clear statutory language "if he considers it feasible," Appellants argue that § 195 requires the Secretary to statistically adjust the census "if feasible."[7] However, it is "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001) (internal quotation marks and citation omitted). Thus, we cannot accept Appellants' proposed statutory interpretation because it renders the "if he considers it" portion of the phrase meaningless.
 
 
 40
 In addition, Appellants argue that the statutory language in § 195 creates a presumption in favor of the adjusted data. They cite Board of Pardons v. Allen, 482 U.S. 369, 378, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), as support for the proposition that the use of the term "shall," followed by the discretionary language "if he considers it," creates a "presumption in favor of doing that which is the subject of the statute." However, Allen itself reveals the error in Appellants' argument.
 
 
 41
 In Allen, the Supreme Court held that a Montana statute created a liberty interest in parole when it provided that the parole "`board shall release on parole ... any [prisoner] ... when in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community.'" 482 U.S. at 376, 107 S.Ct. 2415 (first ellipses in original) (quoting MONT. CODE ANN. § 46-23-201 (1985)). In holding that the parole statute created a presumption of release once the predicate conditions had been found, the Supreme Court did not engraft on the statute a presumption that the parole board find the prisoner did not pose a danger to herself or to the community.[8] Rather, the parole board retained "very broad" discretion to determine whether those conditions had been met in the first place. See id. at 381, 107 S.Ct. 2415 (relying on Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)).
 
 
 42
 Similarly, § 195 does not stack the deck in favor of a finding of feasibility by creating a presumption that the adjusted data is more accurate than the unadjusted or headcount data. We would be remiss if we were to interpret § 195 in such a way as to require the Secretary to statistically adjust the census even if he and a panel of experts were uncertain as to the reliability of the adjusted data, just as the Montana legislature surely did not intend for the state parole board to release a prisoner whose potential for future detriment could not be ascertained. The better reading of the statute is that Congress intended to strongly encourage the use of sampling; however, it left to the Secretary meaningful discretion whether a sampling methodology should be used in any given instance.
 
 
 43
 Viewing § 195 in the context of the Census Act as a whole, we are further convinced that Congress has delegated to the Secretary discretion to choose appropriate methodologies and different sampling techniques. Most notably, § 141(a) confers broad discretion to the Secretary to conduct the census "in such form and content as he may determine, including the use of sampling procedures and special surveys." 13 U.S.C. § 141(a).
 
 
 44
 Because Congress conditioned the use of sampling on the Secretary's consideration of its feasibility, § 195 does not create a presumption in favor of statistical adjustment of the census, nor does it require the Secretary to consider the adjusted data as the default data for Census 2000. Instead, § 195 grants broad discretion upon the Secretary to "consider" as an initial matter what uses of sampling are "feasible."
 
 
 45
 b. The Term "Feasible" is Ambiguous
 
 
 46
 Appellants also argue that § 195 admits of little administrative discretion because the Secretary is empowered to decide only whether a use of sampling is minimally feasible, i.e., "capable of being done, executed, or effected." However, unlike other cases in which the statutory term "feasible" was limited to physical possibility, this proposed definition would run counter to the statutory objectives of the Census Act. Thus, we find that the term "feasible" as used in § 195 is an ambiguous term left open to the Secretary's reasonable interpretation.
 
 
 47
 It is well established that we must consider the context in ascertaining the meaning of the statute. Brower v. Evans, 257 F.3d 1058, 1065 (9th Cir.2001). The context relevant to our analysis "relates to `the design of the statute as a whole and to its object and policy.'" Id. (quoting Gozlon-Peretz v. United States, 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991)). We "`may consider the purpose of the statute in its entirety, and whether the proposed interpretation would frustrate or advance that purpose.'" Id. (quoting United States v. Mohrbacher, 182 F.3d 1041, 1049 (9th Cir.1999)).
 
 
 48
 Appellants do not dispute the fact that the overall goal of the Census Act is accuracy. See Wisconsin, 517 U.S. at 5, 116 S.Ct. 1091(so stating). Yet, their proposed definition of "feasible" would run counter to this goal. Their proposed definition would require the Secretary to use sampling so long as it was capable of being done even if the methodology was flawed and produced skewed results. Thus, "feasible" must mean more than sheer physical or financial possibility. Indeed, the plain meaning of "feasible" incorporates whether a particular action is "capable of being successfully done or accomplished." BLACK'S LAW DICTIONARY 739 (4th ed.1957) (emphasis added). Whether a task can be done "successfully" necessarily derives its meaning from the objective at hand. Because the fundamental objective of the Census Act is accuracy, the use of sampling could not be successful if its methodology or result was inaccurate.
 
 
 49
 Accordingly, § 195 must be read in light of the overall purpose of the Census Act in order to avoid flawed results. Nevertheless, it is unclear to what extent the Secretary may consider accuracy in his feasibility determination. Must he be 50%, 75%, or 99% certain that the use of sampling would produce accurate results? Section 195 leaves these questions unanswered. Because § 195 does not specify the circumstances under which the Secretary must find sampling feasible, the statutory term remains ambiguous. See Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1254(10th Cir.1998) (finding that statutory phrase "to the maximum extent practicable" was ambiguous because its ordinary meaning did not "specif[y] the circumstances" under which the agency could forgo its statutory 90-day deadline).
 
 
 50
 Further, the choice of language "if he considers it" as a pre-condition of "feasible" demonstrates that Congress intended for the Secretary to make such judgment calls. This phrase indicates that Congress did not intend to limit the Secretary's discretion to a finding of whether a particular use of sampling is capable of being done. Rather, it left the choice to the Secretary as to whether sampling could be used, bringing to bear his expertise on the effectiveness of different statistical methodologies and their compatibility with the other aspects of the census. Thus, unlike other cases in which the agency had "little administrative discretion" in making a feasibility determination, § 195 reflects Congress' intent for the Secretary to strike a balance as to the feasibility of using sampling in any given instance. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (holding that discretion was severely constrained when statute forbid construction on "any public parkland unless [] there is no feasible and prudent alternative to the use of such land") (quoting 23 U.S.C. § 138 (1964 ed., Supp. V)); cf. Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 508-09, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (holding that Congress had struck policy balance in enacting statute that agency "`shall set the standard which most adequately assures, to the extent feasible, ... that no employee will suffer[health detriments]'") (quoting 29 U.S.C. § 655(b)(5) (1970)).
 
 
 51
 In sum, by providing an open definition of "feasible," qualifying it further with the language "if he considers it feasible," and refraining from the inclusion of any criteria to guide the Secretary's decision, the statute conferred discretion upon the Secretary to establish his own standard for determining the feasibility of using the adjusted data.[9] 13 U.S.C. § 195 (emphasis added). Thus, the Secretary's interpretation of § 195 need only be "reasonable." Chevron, 467 U.S. at 843, 104 S.Ct. 2778.
 
 2. Secretary's Interpretation of § 195
 
 52
 Because we have concluded that Congress has not spoken to the precise question at issue, we must defer to the Secretary's interpretation of § 195. We will uphold his interpretation so long as it is "based on a permissible construction of the statute." Id. If his "reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer `[we] would have reached if the question initially had arisen in a judicial proceeding.'" Regions Hosp. v. Shalala, 522 U.S. 448, 457, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) (quoting Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. 2778).
 
 
 53
 The Secretary interpreted § 195's statutory term "feasible" as having two components: (1) operational feasibility (logistical possibility) and (2) technical feasibility (increased accuracy). 65 Fed.Reg. at 38,379-80. Operational feasibility refers to the "Bureau's ability to conduct the A.C.E. with available resources and within required deadlines or time frames." Id. at 38,380. "Technical feasibility," on the other hand, refers to whether "the A.C.E. statistical methodology ... will improve the accuracy of the census for non-apportionment uses of the data." Id.
 
 
 54
 The A.C.E. Report set forth an objective framework for evaluating the technical feasibility of the A.C.E. data according to: "(1) the conduct of key operations, (2) the consistency of the A.C.E. results with historical measures of undercount, and (3) measures of quality." 65 Fed.Reg. 38,387. The A.C.E. Report stated that its preliminary analysis had "led it to expect that the A.C.E. will improve overall numeric and distributive accuracy and that it will reduce the differential undercount." Id. Thus, it tentatively recommended that "statistical correction is appropriate absent strong evidence that it will degrade the overall quality of the final census data." Id. Nevertheless, it refrained from making a final determination until after ESCAP had studied the data in light of the above criteria. Id. Subsequently, ESCAP adopted the A.C.E. Report's criteria for evaluating the feasibility of statistical adjustment and studied the effectiveness of the A.C.E. data to see if its expectations for improved accuracy had, in fact, been met. 66 Fed.Reg. 14,004.
 
 
 55
 We find that this interpretation of § 195 is a permissible reading of the statute. The Secretary's definition of "feasible" reflects the plain meaning of the term feasible, i.e., whether the adjustment of Census 2000 was "capable of being successfully done or accomplished." BLACK'S LAW DICTIONARY 739 (4th ed.1957). The inclusion of accuracy in the Secretary's interpretation of "feasible" is reasonable in light of Congress' objective to attaining as accurate a census as possible. See Regions Hosp., 522 U.S. at 457, 118 S.Ct. 909. Further, the criteria by which the A.C.E. data were to be evaluated creates an appropriate standard against which the achievement of improved accuracy could be assessed.
 
 
 56
 Appellants accept the A.C.E. Report as the proper frame-work for guiding the Secretary's adjustment decision. But, they argue that the A.C.E. Report established a legal standard, which bound the Secretary to order adjustment unless he found "strong evidence" that it would degrade the overall census results.
 
 
 57
 Appellants' argument is unavailing. It is clear from the context of the A.C.E. Report that its determinations were tentative in nature. Although the A.C.E. Report suggested that "strong evidence" should be found in order to decide against adjustment, the Report cautioned that the Bureau still needed to "conduct an objective review before making a final determination to release the statistically corrected data." 65 Fed.Reg. 38,387. It concluded that the Bureau "will not ... release corrected redistricting data until it has brought its technical judgment to bear in assessing the available data to verify that its expectations [of improved accuracy] have been met." Id. at 38,393.
 
 
 58
 In addition, the statements made in the A.C.E. Report did not have the force of law because the A.C.E. Report was not the product of a formal adjudication or notice-and-comment rulemaking. See Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that opinion letters and other interpretations that are not "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking ... lack the force of law" and "do not warrant Chevron-style deference"). Therefore, we need not defer to its statements implying that statistical adjustment would be presumed unless the Secretary was able to point to strong evidence of unreliability. Id.
 
 
 59
 Accordingly, the A.C.E. Report did not limit ESCAP's discretion to a "strong evidence" determination. Instead, the A.C.E. Report set forth an objective framework for guiding ESCAP's analysis of the operational success of the A.C.E. according to certain specified criteria. Moreover, it made clear that the use of the adjusted data was contingent on ESCAP's verification of its expectancy that the A.C.E. would improve the census overall.
 
 3. Secretary's Feasibility Determination
 
 60
 Having found that the Secretary permissibly interpreted § 195, we must next decide whether his adjustment decision was arbitrary or capricious. Under the APA, the Secretary's adjustment decision must stand unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).
 
 
 61
 We have held that a decision is "considered arbitrary and capricious" if the agency relied on irrelevant factors, failed to consider a crucial aspect of the issue before it, offered an explanation that runs counter to the evidence, or "`is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Midwater Trawlers Co-op. v. Dep't of Commerce, 282 F.3d 710, 720(9th Cir.2002) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Our inquiry must "be searching and careful, but the ultimate standard of review is a narrow one." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotation marks and citation omitted). We must not substitute our judgment for that of the Secretary. See id.
 
 
 62
 In determining that the use of the A.C.E. data was not feasible, i.e., would not improve the accuracy of the census, ESCAP considered the criteria set forth in the A.C.E. Report. The ESCAP Report stated that its study included: "(1) a consideration of operational data to validate the successful conduct of the A.C.E.; (2) whether the A.C.E. measures of undercount were consistent with historical patterns of undercount and independent demographic analysis benchmarks; and (3) a review of quality measures." 66 Fed.Reg. 14,004. Following weeks of studying "voluminous evidence," ESCAP found some disturbing inconsistencies and possible errors in the methodology. Because it was unable to resolve its concerns "in the time available," it recommended against the release of the adjusted data for redistricting purposes. Id. at 14,005.
 
 
 63
 In analyzing the A.C.E. data, ESCAP found a "surprising inconsistency between the DA [demographic analysis] and A.C.E. estimates." Id. at 14,012. Whereas the demographic analysis estimated that the unadjusted census overcounted the population by 1.8 million persons, the A.C.E. indicated that the census had undercounted the population by 3.3 million persons. Id. at 14,012-13. Even assuming that undocumented immigration had doubled during the 1990s, the demographic analysis estimated an undercount of only 0.9 million persons. Id. at 14,013. Although the source of the problem could also have been the 1990 census data or the demographic analysis techniques, ESCAP had pinpointed other concerns about corruption of the A.C.E. data and, therefore, concluded that the inconsistency might be attributable to "an as—yet undiscovered problem in the A.C.E. or census methodology." Id. at 14,005; see also id. at 14,015.
 
 
 64
 Two factors, in particular, called into question the reliability of the A.C.E. data. First, ESCAP expressed concern that "synthetic error" might have corrupted the data. Id. at 14,015. Synthetic error, in this case, may have resulted from the assumption that persons in a particular group would be undercounted by the initial census consistently nationwide. Id. Based on its studies, ESCAP found that synthetic error might have led to an error in estimating the population of certain groups by as much as 58%. Id. at 14,016.
 
 
 65
 Second, ESCAP was concerned that "balancing error" had occurred. Id. The A.C.E. was conducted by use of two different surveys: the P-sample (an independent survey used to measure missed persons) and the E-sample (a re-examination of census records used to measure erroneous inclusion of persons). Id. Balancing error may have occurred because the P-samples and the E-samples were handled differently, with more time and effort spent on the P-samples. Id. Accordingly, ESCAP found that the "error could introduce an upward bias" in the A.C.E. data, thereby explaining the greater undercount found by the A.C.E. Id.
 
 
 66
 Based on these reasons, ESCAP recommended against the use of the A.C.E. data. It explained:
 
 
 67
 The ESCAP's recommendation to use the unadjusted data was a difficult one. The Committee conducted a number of analyses directed at understanding the inconsistency with demographic analysis and the synthetic and balancing error issues, but could not find a complete explanation in the time available. The Committee believes it likely that further research may establish that adjustment based on the A.C.E. would result in improved accuracy. However, the uncertainty due to these concerns is too large at this time to allow for a recommendation to adjust.
 
 
 68
 Id. at 14,005.
 
 
 69
 Appellants argue that the ESCAP Report misapplied the "strong evidence" standard set forth in the A.C.E. Report and reversed the presumption in favor of the adjusted data. Their argument rests upon statements in the ESCAP Report that "the majority of the evidence" suggested the adjusted data was more accurate. However, Appellants mischaracterize the record. Each of ESCAP's statements regarding the improved accuracy of the adjusted data was tempered with ESCAP's concern regarding possible errors in the A.C.E. data or methodology.[10]
 
 
 70
 Moreover, Appellants unpersuasively attempt to construct a legal standard out of a scientific inquiry. We agree with the District Court's reasoning that "[t]he meaning of strong evidence should not be gauged by comparison to legally derived standards of proof, such as ... `preponderance of the evidence.'" City of Los Angeles v. Evans, No. CV-01-01671-GAF, slip op. at 24 (C.D.Cal. Apr. 26, 2001). Rather, considering that ESCAP's study was a technical assessment of the A.C.E. data, "[s]trong evidence in that context was meant to mean the sort of evidence that would give professionals in the field pause" before recommending the use of the adjusted data. Id.
 
 
 71
 In the alternative, Appellants challenge the strength of the evidence against the A.C.E. data, asserting that ESCAP was being "overcautious." They point to one article, which has asserted that ESCAP's concerns were "weak and derivative in nature." See (Margo Anderson & Stephen E. Fienberg, Counting and Estimation: Methodology for Improving the Quality of Censuses 14-16 (2001)).
 
 
 72
 However, because the determination as to whether ESCAP's concerns were warranted "`requires a high level of technical expertise,' we must defer to `the informed discretion of the responsible federal agenc[y].'" Marsh, 490 U.S. at 377, 109 S.Ct. 1851 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). As one district court aptly observed, disputes regarding the Bureau's use of statistics in taking the census "are best resolved not by the courts but by the Bureau itself, whose experience with prior censuses and expertise in the collection and analysis of statistical information render it especially qualified to make the appropriate decisions." City of Philadelphia v. Klutznick, 503 F.Supp. 663, 676 (E.D.Pa.1980).
 
 
 73
 We cannot substitute our judgment for that of the agency charged with administering § 195. Marsh, 490 U.S. at 376, 109 S.Ct. 1851. Under our narrow standard of review, it is sufficient that the Bureau's panel of experts decided, based on their consideration of the relevant factors, that the data carried too high a risk of a fundamental flaw and could not be certain within the time frame allotted that the adjusted data would improve the accuracy of the census.[11] Given the substantial divergence of the A.C.E. data from the demographic analysis, as well as concerns with synthetic and balancing error, we cannot say that the Secretary's adoption of ESCAP's recommendation not to use the adjusted data was "arbitrary or capricious." Therefore, we uphold his adjustment decision.
 
 
 74
 B. Revocation of "Daley Rule"
 
 
 75
 Appellants raise an additional challenge to Secretary Evans' adjustment decision. Appellants argue that he did not have the authority to make the decision because it had been delegated to the Director of the Bureau by the Daley Rule. Further, they assert that Secretary Evans' attempt to revoke this rule was ineffective because it failed to comply with the APA's notice-and-comment procedures.
 
 
 76
 Assuming arguendo that the Daley Rule was substantive and that the revocation was accomplished improperly, the revocation was harmless error because the Director of the Bureau also adopted ESCAP's recommendation not to use the statistically adjusted data for purposes of redistricting. See Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1487(9th Cir.1992) (holding that APA requires us to take "due account" of "harmless error"). In other words, we know that the result would have been exactly the same even if the delegation had remained in place; all decision-makers, including the Director of the Bureau, rejected the use of the adjusted data. Thus, we decline to overturn the Secretary's adjustment decision on the basis that it was violative of the APA's notice-and-comment procedures.
 
 IV. CONCLUSION
 
 77
 Section 195 confers broad discretion on the Secretary to decide if and when sampling is feasible in the taking of the decennial census. We find that Secretary Evans' interpretation of the statute, as permitting him to consider accuracy as a component of feasibility, was a permissible construction of the statute. Further, his decision not to statistically adjust Census 2000 was neither arbitrary nor capricious. Finally, no harm flowed from any violation of the APA's notice-and-comment procedures. Therefore, we uphold Secretary Evans' adjustment decision. Because we affirm the District Court's dismissal of the action, we need not address the question whether injunctive relief would have been an appropriate remedy in this case.
 
 
 78
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The studies were conducted pursuant to the Decennial Census Improvement Act of 1991, Pub.L. No. 102-135, 105 Stat. 635. The Act required NAS to study the "means by which the Government could achieve the most accurate population count possible," considering,inter alia, "the appropriateness of using sampling methods, in combination with basic data-collection techniques or otherwise, in the acquisition or refinement of population data." 105 Stat. at 635 § 2(a)(1) (codified at § 141 note (1991)).
 
 
 [2]
 Section 141 requires the Secretary to provide a tabulation of state populations within one year of the decennial census date. 13 U.S.C. § 141(c)
 
 
 [3]
 The Daley Rule was originally proposed under former Secretary Daley in June 2000. However, the final rule was promulgated under his successor, Secretary Norman Mineta. 65 Fed.Reg. 59,716
 
 
 [4]
 As discussed further below, "synthetic error" occurs when the statistics rely on a faulty assumption that a segment of the population can be extrapolated to the whole of the populationSee 66 Fed.Reg. 14,015. "Balancing error" occurs when different surveys are handled differently with disparate time and effort spent in their implementation. Id. at 14,016.
 
 
 [5]
 InWisconsin, the Supreme Court explicitly declined to address the question whether § 195 "constrained the Secretary's discretion to statistically adjust the decennial census." 517 U.S. at 20 n. 11, 116 S.Ct. 1091. In Department of Commerce, the Supreme Court addressed the issue of statistical adjustment only for apportionment purposes. 525 U.S. at 343, 119 S.Ct. 765.
 
 
 [6]
 We reject Appellees' argument that the adjustment decision is unreviewable under the APA because it falls within its exception for actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is applicable only "in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."Lincoln v. Vigil, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (internal quotation marks and citations omitted). Here, the Secretary's discretion to "consider" whether sampling is feasible does not defy meaningful judicial review. Unlike other cases in which we have found the statutory grant of discretion so broad that no standard of review could be discerned, § 195 contains mandatory language that the Secretary "shall" use sampling "if he considers it feasible." Cf. Rank v. Nimmo, 677 F.2d 692, 699-700 (9th Cir.1982) (holding that statute, which provided the administrator "may" take action "at [his] option," could not be reviewed because it vested the "widest discretion possible" in the administrator).
 Moreover, although the phrase "if he considers it feasible" confers broad discretion, it has its limits. For example, if the Secretary had considered statistical adjustment but decided against it due to his political disinclinations, his decision would violate § 195. See Franklin v. Massachusetts, 505 U.S. 788, 817, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring). Thus, this is not a situation in which there is "no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 [7]
 Appellants overly rely on dictum inDepartment of Commerce in proffering this interpretation. Therein, the Supreme Court stated that the 1976 amendments to the Census Act "changed a provision that permitted the use of sampling ... into one that required that sampling be used for such purposes if `feasible.'" 525 U.S. at 341, 119 S.Ct. 765. However, we cannot seriously weigh this statement in our statutory analysis because to do so would render the phrase "if he considers it" superfluous. Further, the Supreme Court failed to explain or even acknowledge its disregard for this phrase. Under these circumstances, we doubt the Court would wish us to disregard this language for purposes of statutory interpretation.
 
 
 [8]
 Although we findAllen instructive as to this point, we do not think that Allen or its progeny control. Those cases involved a very different issue — whether a prisoner had a constitutional interest in parole release for purposes of analyzing his due process claim. See Allen, 482 U.S. at 381, 107 S.Ct. 2415. Appellants do not argue here that § 195 created a constitutional interest in the release of the adjusted data.
 
 
 [9]
 Because we reach this conclusion from the statutory text alone, we need not consider Appellees' argument that the legislative history of § 195 is silent as to the issue at hand. Nevertheless, we are inclined to agree that § 195 was enacted to authorize the use of sampling forcollecting supplemental population data, not the replacement of initial head-count data. See Utah, 122 S.Ct. at 2201-02; Dep't of Commerce, 525 U.S. at 339, 119 S.Ct. 765 ("As amended, the section now requires the Secretary to use statistical sampling in assembling the myriad demographic data that are collected in connection with the decennial census.") (emphasis added).
 
 
 [10]
 For example, the ESCAP Report stated that "absent the concerns noted above, adjustment would result in more accurate data at the state, congressional district, and county levels." 66 Fed.Reg. 14,006 (emphasis added).
 
 
 [11]
 In fact, these concerns were borne out by further research. On October 17, 2001, ESCAP released a second report recommending against the use of A.C.E. for all other purposes based on its finding that the adjusted data "overstated the net undercount by at least 3 million persons."See Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy on Adjustment for Non Redistricting Uses, 66 Fed.Reg. 56,006 (Nov. 5, 2001). Attributing the problem to balancing error, the Report explained that "the A.C.E. failed to measure a significant number of census erroneous enumerations, many of which were duplicates. This level of error in the A.C.E. measurements of net coverage is such that the A.C.E. results cannot be used in their current form." Id.
 
 
 
 79
 REINHARDT, Circuit Judge, dissenting.
 
 
 80
 Section 195 of the Census Act requires that, for purposes other than apportionment, the Secretary of Commerce "shall" authorize the use of statistical sampling methods to compensate for errors in the census "if he considers it feasible." 13 U.S.C. § 195. The majority approves the Secretary's decision not to authorize statistical sampling, although the record shows that the Secretary did not consider whether such sampling was feasible, or at least did not base his decision on that consideration, as the statute requires. Furthermore, even if the Secretary had considered whether sampling was feasible, he could not have reached the conclusion that he did under a reasonable definition of the word "feasible."
 
 
 81
 No census has ever succeeded in counting every person residing in the United States. The 1990 census, according to the Census Bureau's estimate, resulted in an undercount of 1.8%, or 4.7 million people. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, REPORT TO CONGRESS—THE PLAN FOR CENSUS 2000, at 2 (revised Aug. 1997)[hereinafter PLAN FOR CENSUS 2000]. Studies by the Bureau since 1940 have also shown that, decade after decade, some groups of people are much more severely undercounted than others. Groups subject to this "differential undercount" include racial and ethnic minorities, children under the age of 18, and people who rent rather than own their homes.[1]
 
 
 82
 The differential undercount has a profound and unjust effect on polities and communities in which members of undercounted groups disproportionately reside. Billions of dollars of state and federal funds marked for distribution on the basis of population are, in fact, distributed on the basis of these inaccurate census data. See, e.g., P-RICE WATERHOUSE COOPERS, EFFECT OF CENSUS 2000 UNDERCOUNT ON FEDERAL FUNDING TO STATES AND LOCAL AREAS, 2002-2012, at i (2000) (study prepared for U.S. Census Monitoring Board). States also use the census figures as their measure of population when redrawing election districts. PLAN FOR CENSUS 2000, at 4. The result is that residents of some places—particularly places with large numbers of racial and ethnic minorities, children, and non-homeowners—receive less than their fair share of public funds and services and wield less than their proportionate share of electoral power.
 
 
 83
 Statistical sampling is a means of correcting the undercount and the inequities it causes. It was for this purpose that Congress in 1976 amended § 195 of the Census Act to its current form, requiring the Secretary to use statistical sampling "if he considers it feasible." Pub.L. No. 94-521, § 10, 90 Stat. 2459, 2464 (1976) (codified as amended at 13 U.S.C. § 195). In 1991, in response to the inaccuracy of the 1990 census, Congress went still further, directing the Commerce Department to contract with the National Academy of Sciences (NAS) to "study ... the means by which the Government could achieve the most accurate population count possible." Decennial Census Improvement Act of 1991, Pub.L. No. 102-135, § 2(a), 105 Stat. 635. The 1991 Act specifically required the NAS to "consider ... the appropriateness of using sampling methods, in combination with basic data-collection techniques or otherwise, in the acquisition or refinement of population data." Id. § 2(b).
 
 
 84
 It is important to observe how these two pieces of legislation work together. The 1976 amendment to the Census Act instructs the Secretary that if he "considers" sampling to be feasible, he must authorize its use; the 1991 Act establishes a specific method for "consider[ing]" the use of sampling, namely a scientific evaluation to be conducted by the NAS.
 
 
 85
 The NAS did conduct a study and concluded not only that sampling was appropriate, but furthermore that "improved coverage or data quality" could not be achieved by "traditional Census methods of physical enumeration," even with additional funding. See PLAN FOR CENSUS 2000, at 7(quoting NAS panel). "[T]o continue trying to count every last person" physically, the NAS reported, "is fruitless." Id. Following the various NAS analyses, the Census Bureau prepared a report to Congress in 1997 that included a plan for Census 2000 providing for a "limited use of sampling" in order to ensure an "accurate and cost-effective census." Id. at 11. The Bureau's Accuracy and Coverage Evaluation (A.C.E.) Report, issued in June 2000, provided a detailed evaluation of the feasibility of the proposed method of statistical sampling and concluded that it was both "operationally and technically feasible," and that barring unforeseen circumstances the adjusted data "will be more accurate than the uncorrected data." Accuracy and Coverage Evaluation, 65 Fed.Reg. 38,374, 38,375 (2000). Then Secretary of Commerce William Daley adopted these conclusions, although a final decision about whether to issue adjusted numbers was deferred until the data were collected and analyzed for reliability.
 
 
 86
 After a change in administration following the disputed presidential election of 2000, however, the Executive Steering Committee on A.C.E. policy (ESCAP), the committee of the Census Bureau charged with evaluating the effectiveness of the A.C.E. sampling program, issued a report recommending the release of the unadjusted figures, rather than the corrected figures, as the official Census 2000 data. ESCAP made this recommendation despite its own evaluation that the "A.C.E. was a design and operational success," that "the A.C.E. operations appear to have been in control, performed as expected, and produced data as good or better than the data produced by the 1990 [post-enumeration survey]," and that "[u]nder what the Committee considered reasonable assumptions, state, congressional district, and county level analyses showed a marked improvement for adjustment." Notice of Recommendation and Report, 66 Fed.Reg. 14,004, 14,004-06, 14,012.
 
 
 87
 ESCAP based its recommendation not to use the A.C.E. figures on its lack of certainty that sampling would improve the accuracy of the census. Id. at 14,005. It cited an unexplained discrepancy between those figures and those that resulted from the Bureau's demographic analysis (DA), which provides an independent benchmark for evaluating Census data. Id. at 14,005, 14,007. ESCAP concluded that the discrepancy most likely resulted from one of the following three causes: (1) inaccuracies in the 1990 Census, resulting in incorrect assumptions for the DA; (2) inaccuracies originating in the DA itself, or (3) inaccuracies in the Census 2000, as corrected by the A.C.E. Id. at 14,012. In other words, ESCAP recommended against using the A.C.E. figures because one of the possible causes of the discrepancy between those figures and the DA involved a problem with the A.C.E. figures, and despite the fact that "a majority of the evidence indicates both the continued existence of a differential undercount of the population and the superior accuracy of the adjusted numbers." Id. at 14,005. Although it found that the adjusted numbers were probably superior, ESCAP recommended against using them because of "[t]he potential for a reversal of these findings." Id. at 14,014 (emphasis added). As the ESCAP concluded, the experts could not be certain within the time frame allotted that the adjusted data would improve the accuracy of the census. Id. at 14,005. That, as I explain below, does not constitute a determination as to feasibility, or even a consideration of that question.
 
 
 88
 The DA and the A.C.E. did agree in one important respect: Both showed that "Census 2000 perpetuated the historic phenomenon of the differential undercount." Id. at 14,007.
 
 
 89
 Acting Census Bureau Director William Barron, Jr., who was a member of ESCAP, forwarded to the newly appointed Secretary of Commerce Donald Evans his recommendation that the Secretary not release the adjusted data. On March 6, 2001, Secretary Evans adopted the ESCAP recommendation and ordered that the unadjusted data be released for redistricting and federal funding purposes.
 
 
 90
 Because this court is required to review a federal agency's implementation of its governing statute, the majority is correct that the proper mode of analysis is the two-step framework established in Chevron v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the court must examine the statutory language at issue to determine whether Congress provided a clear directive to the agency. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. If, however, the statute does not provide a clear answer, the Court must uphold the agency's interpretation if it is "reasonable." Id. at 844, 104 S.Ct. 2778.
 
 
 91
 The statutory language at issue provides that "the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as `sampling' in carrying out the provisions of this title." 13 U.S.C. § 195. In my view, the Secretary violated the clear intent of Congress by failing to base his decision on a "consider[ation]" of whether sampling was feasible. I would therefore consider the matter settled under Chevron step one. Furthermore, even if I were persuaded that the Secretary did "consider" feasibility, I believe the record precludes a finding that he considered sampling not to be "feasible" under any reasonable definition of the word. In short, any conclusion that he reached would necessarily be arbitrary and capricious. I would, therefore, hold that his decision must be rejected under Chevron step two as well.
 
 
 92
 Under the majority's interpretation, § 195 does not require the Secretary to do anything; rather, Congress's use of the word "shall" merely "demonstrates Congress' intent to strongly encourage the use of sampling." Maj. op., at 869-70 (emphasis added). Courts, however, do not customarily ascribe to the word "shall" the sense of "encourage[ment]." To the contrary, long established Supreme Court law describes the word "shall" as creating a mandatory obligation. See, e.g., Lopez v. Davis, 531 U.S. 230, 241, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001) ("The statute's use of the permissive `may' contrasts with Congress' use of a mandatory `shall' elsewhere in [the statute] to impose discretionless obligations...."); Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 31, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) ("The Panel's instruction comes in terms of the mandatory `shall,' which normally creates an obligation impervious to judicial discretion.").
 
 
 93
 The mandatory effect of the word "shall" in this instance is confirmed by the statutory history. Before the 1976 amendments, § 195 was highly permissive. As adopted in 1957, it read, "[T]he Secretary may, where he deems it appropriate, authorize the statistical method known as sampling." Pub.L. No. 85-208, 71 Stat. 484 (emphasis added). The 1976 amendments replaced the permissive "may" with the mandatory "shall": "[T]he Secretary shall, if he considers it feasible, authorize the statistical method known as sampling." Pub.L. No. 94-521, § 10, 90 Stat. 2459, 2464 (emphasis added). This change in language clearly evinces congressional intent to create a mandatory obligation on the part of the Secretary. Under the majority's interpretation, however, the new language has precisely the same effect as the old. See United States v. Redman, 35 F.3d 437, 441 (9th Cir.1994) ("The amendment of language ... must properly be understood as evidence of an intent to abandon the standard established by the old language in favor of something different.").
 
 
 94
 By changing the language of the statute from "may" to "shall," Congress demonstrated a clear preference for the use of sampling and limited the scope of the Secretary's discretion to prevent its use. The "may" of the pre-1976 provision allowed the Secretary to base his determination whether to authorize sampling on whatever factors he reasonably found relevant, including whether as a general or abstract matter he considered sampling to be a more desirable process than employing unadjusted data. The decision whether to use sampling might properly have involved a wide range of philosophical and public policy issues. Before 1976, the Secretary was invited to weigh all such considerations in making his determination. By amending the statute, however, Congress effectively answered the indefinite range of policy questions — and answered them in favor of sampling. It concluded that sampling is to be used, when and if feasible. The determination as to feasibility was vested in the Secretary, who was to exercise his reasoned discretion in making that judgment. Under the amended statute, the Secretary's discretion is limited to one consideration: whether he considers sampling to be feasible in the particular instance. He may not consider whether sampling would, as a general proposition, be fair, what its political consequences would be, or whether it is certain to produce better data. His discretion is limited to the essentially practical determination of whether sampling, in his considered judgment, is feasible, given the particular circumstances.
 
 
 95
 The import of the change in language is confirmed by the Senate Committee Report, which expresses the desire of Congress to "require" the use of statistical sampling by the Census Bureau:
 
 
 96
 Section 10 [of the 1976 Census Act] amends section 195 of title 13, U.S.C., to require that the Secretary of Commerce authorize the use of sampling procedures in carrying out the provisions of this title whenever he deems it feasible, except in the apportionment of the U.S. House of Representatives. This differs from present language which grants the Secretary discretion to use sampling when it is considered appropriate. The section as amended strengthens congressional intent that, whenever possible, sampling shall be used.
 
 
 97
 Report of the Senate Post Office and Civil Service Committee, 94-1256 at 6 (emphasis added), reprinted in 1976 U.S.C.C.A.N. 5463, 5468.
 
 
 98
 Finally, the Supreme Court has explicitly stated that the change in the language of § 195 created a mandatory obligation. Department of Commerce v. House of Representatives, 525 U.S. 316, 341, 119 S.Ct. 765, 142 L.Ed.2d 797 ("[T]he amendments.... changed a provision that permitted the use of sampling for purposes other than apportionment into one that required that sampling be used for such purposes `if feasible'"). The majority dismisses the Supreme Court's statement as dictum, too lightly in my view. See United States v. Montero-Camargo, 208 F.3d 1122, 1132 n. 17 (9th Cir.2000) ("[W]e do not blandly shrug ... off [Supreme Court dicta] because they were not a holding.") (internal quotation marks omitted).
 
 
 99
 The majority argues that its unusual interpretation of "shall" is necessitated by the phrase, "if he considers," which confers discretion on the Secretary. To give the word "shall" its generally accepted meaning, the majority argues, "renders the `if he considers it' portion of the phrase meaningless." Maj. Op. at 870. The very opposite is the case, however. It is the majority's interpretation of "if he considers" that renders the phrase "shall" meaningless. Under the majority's interpretation the Secretary's discretion is so broad that he may disregard Congress's preference for sampling, regardless of whether sampling is objectively demonstrated to be manifestly feasible. The majority effectively glosses "if he considers it feasible" as "if he wants to do it." In its effort to give meaning to one key term — "if he considers" — the majority frustrates the basic purpose and intent of the statute.
 
 
 100
 There is no need to reach this unattractive result. Section 195 requires the Secretary to authorize sampling whenever a certain specified condition is met: when the Secretary "considers" sampling to be feasible. Thus the Secretary can not fulfill his obligation under the statute without "consider[ing]" the question of feasibility, because without considering feasibility, it is impossible for him to know whether he must authorize sampling. Unavoidably, then, the statute requires the Secretary both to consider the feasibility of sampling and to base his decision whether to authorize sampling on that consideration.
 
 
 101
 "The word `consider' in its ordinary usage means `to reflect on' or `think about with a degree of care or caution.'" Finley v. Nat'l Endowment for the Arts, 100 F.3d 671, 689 (1981) (quoting Webster's Third New International Dictionary 483), rev'd on other grounds, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). The meaning of the word "considers" in the context of § 195 is also informed by the language of the Decennial Census Improvement Act of 1991, discussed above, in which Congress ordered the Secretary to contract with the NAS for a scientific study that would "consider ... the appropriateness of using sampling methods, in combination with basic data-collection techniques or otherwise, in the acquisition or refinement of population data." Decennial Census Improvement Act of 1991, Pub.L. No. 102-135, § 2(b), 105 Stat. 635 (emphasis added). By requiring the Secretary to use a study by the NAS as a means of considering whether sampling is feasible, the 1991 Act shows congressional intent that the Secretary base his consideration of feasibility, at least in part, on objective scientific considerations.
 
 
 102
 The record shows that the Secretary did not base his decision not to authorize sampling on scientific or on any other considerations as to whether sampling was "feasible" and that he therefore violated the clear intent of Congress. Everything in the record pertaining to the question of feasibility, including the NAS study, the A.C.E. Report, and the ESCAP Report, demonstrates that sampling was feasible — feasible both operationally and technically, as the A.C.E. Report put it — and that it would most likely yield data more accurate than the unadjusted figures. The Secretary disregarded the question of feasibility and instead simply adopted the final recommendation of ESCAP not to authorize sampling because the Committee could not be "certain" that sampling would produce more accurate data. ESCAP did not base its recommendation on whether sampling was feasible, but rather on whether it could be certain that sampling would improve the data. Because the Secretary adopted the recommendation of ESCAP, and therefore, like ESCAP, did not base his decision on a consideration of feasibility, I would hold that he violated the clear intent of Congress and would reverse the decision of the district court.
 
 
 103
 The majority passes over the Secretary's failure to base his decision on a consideration of feasibility and focuses instead on the malleability of the word "feasible." Although I believe that the record shows a failure of the Secretary to consider feasibility, I will also discuss the word "feasible," in order to show that, if the Secretary did, as the majority believes, consider "feasib[ility]," only an unreasonable definition of that word could have led him to the conclusion that sampling was not feasible. Because the Secretary could not have employed a reasonable definition of "feasible," this court would be obligated to reverse the Secretary's decision under step two of Chevron, even if we were not obligated to do so under step one.
 
 
 104
 The majority asserts that "the plain meaning of `feasible' incorporates whether a particular action is `capable of being successfully done or accomplished.'" Maj. op. at 872. The term is ambiguous, the majority argues, as to how certain the Secretary must be "that the use of sampling would produce accurate results" in order to consider sampling feasible. Id. at 872. Because a level of uncertainty remained regarding the accuracy of the adjusted numbers, or as the majority says, the experts "could not be certain within the time frame allotted that the adjusted data would improve the accuracy of the census," the Secretary could, in his discretion, find it not feasible to use them. Id. at 876.
 
 
 105
 The Secretary was required to consider whether sampling was feasible, not whether it was "certain within the time frame allotted that ... [it would] improve the accuracy of the census." (Emphasis added.) The majority's own definition of "feasible" is "capable of being successfully done." (Emphasis added and emphasis removed.) The majority's construction of the Secretary's definition, in contrast, is "certain" to be successfully done. A reasonable definition of feasible does not extend to certainty, and by allowing the Secretary to define feasibility in those terms, the majority undoes Congress's limitation of the Secretary's discretion through its 1976 amendments.
 
 
 106
 The majority's argument is incorrect because it fails to take into account the nature of the choice that the Secretary faced. On the one hand, the Secretary could release the unadjusted data alone; on the other, he could release both the adjusted and the unadjusted. If feasibility turns on accuracy, therefore, it must turn on the relative accuracy of the adjusted and the unadjusted data. Although both data sets were certain to be inaccurate in various ways, all the evidence in the record points to the greater accuracy of the adjusted numbers. Most important, the ESCAP report, the recommendation of which the Secretary adopted, found that the sampling procedure was likely to produce more accurate results. Thus, if accuracy or certainty of success was the Secretary's measure of feasibility, releasing the adjusted numbers was more feasible than releasing the unadjusted numbers alone. Under the majority's approach, then, the Secretary permissibly chose the less feasible option, on the ground that he did not consider the more feasible option feasible. Because this conclusion is not possible under a reasonable definition of "feasible," I would hold that the Secretary's decision must be rejected under step two of Chevron.
 
 
 107
 In addition, by choosing the less feasible option, the Secretary arbitrarily reversed the congressional preference for sampling and adopted a preference for using unadjusted data. The record is clear that, if the adjusted and unadjusted systems had been viewed neutrally or without a predisposition in favor of unadjusted data, the Secretary could not have concluded that sampling would not be feasible. Only by presuming that unadjusted data is more accurate, and that such presumption can be overcome only by demonstrating with certainty that sampling is more accurate, could the Secretary have reached the determination he did. Such a presumption is not only contrary to all the evidence in the record, but to the purpose, intent and language of the census statute as well.
 
 
 108
 Finally, I might note that the majority's reliance on the statement that the experts were unable to make a determination with certainty "within the time frame allotted" exceeds all tolerable limits of bureaucratic ineptitude and gives "bureaucracy" an even worse name than it already has. The census is conducted every 10 years. That statute setting forth the Secretary's responsibility had been in effect for well over 20 years. The excuse that the Census Bureau did not have a fair and full opportunity to ascertain feasibility is simply that — a transparent excuse that cannot justify a failure by the Secretary, given all the other facts in the record before him, to conclude that the use of the adjusted data was feasible.
 
 
 109
 In short, I think it evident that the Secretary did not consider feasibility at all. Moreover, if he did, he would have been required to conclude that the use of the sampling method was feasible. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 In 1990, Asians and Pacific Islanders were undercounted by 2.3%, African-Americans by 4.7%, Hispanics by 5.0%, and American Indians living on reservations by 12.2%. Non-Hispanic Whites, in contrast, were undercounted by only 0.7%. Children under the age of 18 accounted for 52% of the undercount, although they composed only 26% of the population. Renters were undercounted by 4.17% in urban areas and 5.92% in rural areas, whereas homeowners were undercounted by only 0.09% in urban areas and 0.03% in rural areas. PLAN FOR CENSUS 2000, at 3-4